ANGELA WEISGARBER,                          )
on behalf of N.C.B., a minor,               )
                                            )
       Plaintiff,                          )
                                            )
v.                                          )          No. 3:13-CV-426
                                            )          (VARLAN/SHIRLEY)
CAROLYN W. COLVIN,                          )
Acting Commissioner of Social Security,     )
                                            )
       Defendant.                          )

## <u>REPORT AND RECOMMENDATION</u>

This case is before the undersigned pursuant to 28 U.S.C. § 636(b), Rule 72(b) of the

Federal Rules of Civil Procedure, and the Rules of this Court for a report and recommendation

regarding disposition by the District Court of the Plaintiff's Motion for Summary Judgment and

Memorandum in Support [Docs. 21, 22] and the Defendant's Motion for Summary Judgment and

Memorandum in Support [Docs. 24, 25].  Plaintiff Angela Weisgarber, on behalf of minor

N.C.B.,[1] seeks judicial review of the decision of the Administrative Law Judge ("ALJ"), the final

decision of the Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("the

Commissioner").

      On July 16, 2010, the Ms. Weisgarber protectively filed an application for supplemental

security income under the Social Security Act on behalf of the Plaintiff, a child under the age of

18.  The application alleged disability since April 1, 2008.  The application was denied initially

and upon reconsideration.  Ms. Weisgarber then requested a hearing, which was held before ALJ

---

[1] To avoid confusion, the Court will refer to Angela Weisgarber as "Ms. Weisgarber" and N.C.B. as "the Plaintiff."

1

Joan A. Lawrence, in Knoxville, Tennessee, on November 15, 2011. The Ms. Weisgarber was present and testified.[2] Thereafter, the ALJ issued an unfavorable decision on January 12, 2012, finding that the Plaintiff was not disabled. The Appeals Council denied Ms. Weisgarber's request for review of that decision; thus, the decision of the ALJ became the final decision of the Commissioner.

Ms. Weisgarber now seeks judicial review of the Commissioner's decision. The Court heard oral argument in this case on May 28, 2014. Thereafter, the Court took the parties' motions, responses, and arguments under advisement.

## I.    ALJ FINDINGS

The ALJ made the following findings:

1. The claimant was born on July 11, 2000. Therefore, he was a school-age child on July 16, 2010, the date application was filed, and is currently a school-age child (20 CFR 416.926a(g)(2)).

2. The claimant has not engaged in substantial gainful activity since July 16, 2010, the application date (20 CFR 416.924(b) and 416.971 *et seq.*).

3. The claimant has the following severe impairments: attention deficit hyperactivity disorder (ADHD) and asthma (20 CFR 416.924(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.24, 416.925 and 416.926).

5. The claimant does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR 416.924(d) and 416.926a).

---

[2] At the request of the Plaintiff's treating physician, the Plaintiff did not attend or participate in the hearing. [Tr. 30, 217].

11. The claimant has not been disabled, as defined in the Social Security Act, since July 1, 2010, the date the application was filed (20 CFR 416.24(a)).

[Tr. 14-23].

## II.    CHILD DISABILITY ELIGIBILITY

To qualify for Supplemental Security Income ("SSI") benefits as a child, a child under the age of 18 must prove that he or she has a "medically determinable physical or mental impairment, which results in marked or severe functional limitations and can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

A child's disability claim is assessed pursuant to a three-step sequential evaluation process. 20 U.S.C. § 416.924(a). At step one, a child must not be engaged in "substantial gainful activity." § 416.924(b). At step two, a child "must have a medically determinable impairment(s) that is severe." § 416.924(c). At step three, the child's "impairment(s) must meet, medically equal, or functionally equal" one of the medical listings found in 20 C.F.R. Part 404, Subpart P, Appendix 1. § 416.924(d).

To "meet" a listing, a child's impairment must satisfy all of the criteria of a listing. § 416.925. To "medically equal" a listing, a child's impairment must be "medically equivalent to a listed impairment." § 416.926(a). To "functionally equal" a listing, a child's impairment "must be of listing-level severity." § 416.926a(a). "Listing-level severity" means that a child has either "marked" limitations in two of the following six domains of functioning or an "extreme" limitation in one of the following six domains of functioning: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4)

3

moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. § 416.926a(b)(1). "These domains are broad areas of functioning intended to capture all of what a child can or cannot  do." Id.  The relevant factors for assessing a child's functional limitations in each domain includes:  (1) how well the child can initiate and sustain activities, requires extra help, and the effects of structured or supportive settings; (2) how the child functions in school; and (3) the effect medication or other treatment has on the child.  § 416.926a(a)(1)—(3).

### III.    STANDARD OF REVIEW

When reviewing the Commissioner's determination of whether an individual is disabled pursuant to 42 U.S.C. § 405(g), the Court is limited to determining "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." Blakley v. Comm'r of Soc. Sec., 581 F.3d 399, 405 (6th Cir. 2009) (citing Key v. Callahan, 109 F.3d 270, 273 (6th Cir. 1997)).  If the ALJ applied the correct legal standards and his findings are supported by substantial evidence in the record, his decision is conclusive and must be affirmed.  Warner v. Comm'r of Soc. Sec., 375 F.3d 387, 390 (6th Cir. 2004); 42 U.S.C. § 405(g).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007) (quotation omitted); see also Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison v. NLRB, 305 U.S. 197, 229 (1938)).

It is immaterial whether the record may also possess substantial evidence to support a different conclusion from that reached by the ALJ, or whether the reviewing judge may have

4

decided the case differently. <u>Crisp v. Sec'y of Health & Human Servs.</u>, 790 F.2d 450, 453 n.4 (6th Cir. 1986). The substantial evidence standard is intended to create a "'zone of choice' within which the Commissioner can act, without the fear of court interference." <u>Buxton v. Halter</u>, 246 F.3d 762, 773 (6th Cir. 2001) (quoting <u>Mullen v. Bowen</u>, 800 F.2d 535, 545 (6th Cir. 1986)). Therefore, the Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." <u>Walters</u>, 127 F.3d at 528.

In addition to reviewing the ALJ's findings to determine whether they were supported by substantial evidence, the Court also reviews the ALJ's decision to determine whether it was reached through application of the correct legal standards and in accordance with the procedure mandated by the regulations and rulings promulgated by the Commissioner. <u>See</u> <u>Wilson v. Comm'r of Soc. Sec.</u>, 378 F.3d 541, 544 (6th Cir. 2004). The Court may, however, decline to reverse and remand the Commissioner's determination if it finds that the ALJ's procedural errors were harmless.

An ALJ's violation of the Social Security Administration's procedural rules is harmless and will not result in reversible error "absent a showing that the claimant has been prejudiced on the merits or deprived of substantial rights because of the [ALJ]'s procedural lapses." <u>Wilson</u>, 378 F.3d at 546-47. Thus, an ALJ's procedural error is harmless if his ultimate decision was supported by substantial evidence *and* the error did not deprive the claimant of an important benefit or safeguard. <u>See id.</u> at 547.

On review, Plaintiff bears the burden of proving his entitlement to benefits. <u>Boyes v. Sec'y. of Health & Human Servs.</u>, 46 F.3d 510, 512 (6th Cir. 1994) (citing <u>Halsey v. Richardson</u>, 441 F.2d 1230 (6th Cir. 1971)).

## IV. POSITIONS OF THE PARTIES

The Plaintiff asserts four separate allegations of error on appeal. First, the Plaintiff contends that the ALJ's step three determination was deficient because the ALJ failed to identify a specific, potentially relevant listing and failed to provide any meaningful discussion regarding whether the Plaintiff met or medically equaled a listing, particularly Listing 112.03. [Doc. 19-20]. Second, and also relating to step three of the sequential evaluation, the Plaintiff argues that the ALJ's functional equivalence analysis was insufficient because the ALJ failed to consider all relevant evidence when assessing the Plaintiff's ability to function in several of the domains. [Id. at 26]. Next, the Plaintiff asserts that the ALJ failed to properly apply the treating physician rule in regards to two physicians: Gordon Greeson, M.D., and Angela Reno, Psy., D. [Id. at 32]. Lastly, the Plaintiff challenges the ALJ's adverse credibility finding, arguing the that ALJ did not properly consider Ms. Weisgarber's testimony and subjective allegations pursuant to Social Security Ruling 96-7p. [Id. at 37].

The Commissioner contends that substantial evidence supports the ALJ's opinion that the Plaintiff did not have an impairment that met or medically equaled a listed impairment, or specifically Listing 112.03, because during the relevant time period in question, the Plaintiff showed significant improvement once his medication was changed. [Doc. 25 at 6]. Similarly, the Commissioner argues that the Plaintiff does not functionally equal a listed impairment because the evidence does not demonstrate "marked" or "extreme" limitations in any of the challenged functional domains. [Id. at 10]. In addition, the Commissioner asserts that any error in the treatment of Dr. Greeson's opinion was harmless because the opinion actually supports the ALJ's finding that the Plaintiff showed improvement during the relevant period in question. [Id. at 13-14]. The Commissioner also alleges that Dr. Reno was not a treating physician, and

6

therefore, the ALJ was not obligated to address her opinion. [Id. at 14]. Nonetheless, the Commissioner asserts that Dr. Reno's opinion actually supports the ALJ's findings. [Id. at 15]. Finally, the Commissioner argues that the ALJ properly considered several factors under Social Security Ruling 96-7p for assessing credibility. [Id. at 16].

## V.    ANALYSIS

The Court will address the Plaintiff's allegations of error in turn.

### A.    Listing 112.03

The Plaintiff argues that the ALJ erred in finding that the Plaintiff did not meet or medically equal a listing. [Doc. 22 at 19]. In this regard, the Plaintiff alleges that the ALJ set forth a bare conclusion that no listing was met or medically equaled without identifying what relevant listing was considered, thereby preventing the Court from performing a meaningful review of the ALJ's finding. [Id.]. It is the Plaintiff's position that Listing 112.03 should have been discussed. [Id. at 20]. While the Plaintiff acknowledges that the harmless error rule applies to a deficient step three analysis, the Plaintiff maintains that the error here was not harmless because the ALJ selectively discussed the medical evidence, ignored several acceptable medical source opinions, and failed to mention the Plaintiff's diagnosis of psychotic disorder and whether the disorder was a severe impairment that meet or medically equaled Listing 112.03. [Id. at 25-26].

The Commissioner argues that looking at the evidence dated July 2010 forward, the date the Plaintiff's application for SSI was filed, the record shows that the Plaintiff experienced improvement with medication changes and was essentially doing much better than what the pre-July 2010 medical evidence depicted. [Doc. 25 at 6]. As a result, the Commissioner maintains

7

that beginning July 2010, the evidence of record demonstrates that that the Plaintiff did not have any marked limitations that would meet or medically equal the criteria set forth in Listing 112.03, and therefore, the Plaintiff is unable to show that he was disabled as of his application date. [Id.].

At step three in the disability determination, the ALJ found that the Plaintiff did not have an impairment or combination of impairments that met or medically equaled any of the regulation's listed impairments. [Tr. 14]. In making this finding, the ALJ stated that she had considered listings 103.00 *et seq.*, Respiratory System, and 112.00 *et seq.*, Mental Disorders, concluding that "the medical evidence does not document listing-level severity, and no acceptable medical source has mentioned findings equivalent in severity to the criteria of any listed impairment, individually or in combination." [Id.].

The Court find's the brevity of the ALJ's step three analysis completely inadequate. In Reynolds v. Comm'r of Soc. Sec., 424 F. App'x 411, 415-16 (6th Cir. Apr. 1, 2011), the Sixth Circuit held that in analyzing the application of a listing, the ALJ must "actually evaluate the evidence, compare it to . . . the Listing, and give an explained conclusion, in order to facilitate meaningful judicial review." Failure to do so makes it "impossible to say that the ALJ's decision at Step Three was supported by substantial evidence." Id. at 416. Here, the ALJ provided no discussion or comparison of the evidence with the criteria of a specific listing. Simply stating that all of the listings under 103.00 and 112.00 have been considered and found not to have been met or medically equaled is precisely the opposite of what is required by Reynolds. The ALJ's truncated discussion prevents this Court from engaging in meaningful review of the ALJ's step three determination. Due to the lack of comparison between a specific listing, particularly Listing 112.03, and any corresponding evidence, the Court is unable to conclude that the ALJ's

8

step three finding is supported by substantial evidence.

The Court further finds that the ALJ's error was not harmless. The <u>Reynolds</u> court explained that in cases where a plaintiff puts forth evidence that makes it possible that he or she might meet or medically equal a listing, the ALJ's error is not harmless. <u>Id.</u> (holding that "in this case, correction of such an error is not merely a formalistic matter of procedure, for it is possible that the evidence Reynolds put forth could meet this listing"). The Court finds that the Plaintiff has submitted evidence that would demonstrate he could meet or medically equal Listing 112.03, and therefore, the Court is unable to say as a matter of law that the ALJ's error was harmless.

Listing 112.03, which deals with Schizophrenic, Delusional (Paranoid), Schizoaffective, and Other Psychotic Disorders, is described as follows:

> Onset of psychotic features, characterized by a marked disturbance of thinking, feeling, and behavior, with deterioration from a previous level of functioning or failure to achieve the expected level of social functioning.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
>
> A. Medically documented persistence, for at least 6 months, either continuous or intermittent, of one or more of the following:
>     1. Delusions or hallucinations; or
>     2. Catatonic, bizarre, or other grossly disorganized behavior; or
>     3. Incoherence, loosening of associations, illogical thinking, or poverty of content of speech; or
>     4. Flat, blunt, or inappropriate affect; or
>     5. Emotional withdrawal, apathy, or isolation;
> AND
>
> B. . . . for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02.

20 C.F.R. § 404, Subpart P, App. 1 (112.00). Listing 112.02(b)(2) requires that the child meet at

9

least two of the following:

> a. Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

> b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

> c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

> d. Marked difficulties in maintaining concentration, persistence, or pace.

Id.

In the present matter, the evidence is quite overwhelming that the Plaintiff could plausibly satisfy the "paragraph A" criteria. For example, the Plaintiff undoubtedly sets forth a history of delusions and hallucinations which has lasted for more than six months. In September 2009, the Plaintiff presented to the emergency room at Youth Villages after being awake for 48 hours in order to receive messages from "monsters" and "wizards." [Tr. 490]. The Plaintiff was diagnosed with psychotic disorder, not otherwise specific, and was recommended that he be hospitalized due to visual and auditory hallucinations. [Tr. 491]. In May 2010, the Plaintiff presented to the emergency room for a second time at Methodist Medical Center after jumping

10

out of a second-story window because voices had told him to run away and jump through the window. [Tr. 347]. He was subsequently hospitalized at Peninsula Psychiatric Hospital for treatment of auditory hallucinations and self-harming behavior. [Tr. 523]. As a result of the Plaintiff's alarming behavior, the Plaintiff's treating physician, Dr. Greeson, referred the Plaintiff to Dr. Reno, a psychologist, in order to conduct a psychological evaluation. At the conclusion of the evaluation, Dr. Reno issued a report in June 2010, finding that the Plaintiff blurred lines between reality and fantasy and suffered from a psychotic disorder, not otherwise specific. [Tr. 293-94].

As pointed out by the Commissioner, however, this evidence predates the Plaintiff's July 2010 application for SSI benefits. See Casey v. Sec'y of Health and Human Servs., 987 F.2d 1230, 1233 (6th Cir.) ("The proper inquiry in an application for SSI benefits is whether the plaintiff was disabled *on or after* her application date.") (emphasis added). Post-July 2010 medical evidence indicates some improvement in the Plaintiff's behavior. For example, in August 2010, Dr. Greeson noted that the Plaintiff denied having any hallucinations or night terrors and had been sleeping better since coming off of Diazepam. [Tr. 468, 475]. The Plaintiff was reported as answering all questions when spoken to directly, had good eye contact, and was under control emotionally. [Tr. 475]. Dr. Reno likewise noted in a follow-up visit in July 2010, that the Plaintiff showed improvement on new medications, including Abilify which replaced Valium. [Tr. 323]. Dr. Reno reported that the Plaintiff had better clarity, few psychotic symptoms, better mood and behavior, and had improved in his overall functioning. [Id.].

The problem the Court has is that this evidence, which only begins to skim the surface of the medical evidence contained in this case, demonstrates two potential different outcomes when comparing the evidence with Listing 112.03. The Plaintiff undoubtedly experienced

11

hallucination and delusions for at least six months, and although the Court is inclined to agree with the Commissioner that the Plaintiff experienced *at least some* improvement subsequent to the date of filing for benefits, the few treatment notes available after July 2010 do not necessarily quantify the level of improvement experienced by the Plaintiff in terms of his psychotic disorder no longer affecting him going forward. After all, despite a positive response to medication changes, Dr. Greeson continued to assess the Plaintiff's Global Assessment of Functioning ("GAF") score at a 48 [Tr. 68, 75], indicating serious symptoms or serious impairments in social, occupational, or school functioning. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34, 4th ed. (revised) 2000. In addition, Dr. Reno recommended that the Plaintiff was still in need of outpatient therapy and continued to work with Plaintiff's family on ways to improve his behavior. [Tr. 323].

The Court further observes that the Plaintiff does not fully develop any argument that he meets or medically equals the "paragraph B" criteria outlined in Listing 112.02. Nonetheless, if the Court were to review the entirety of the evidence in the record and compare the Plaintiff's impairment with Listing 112.03A and B, the Court would essentially be tasked with a *de novo* review of the record which it is not permitted to do. There are simply too many open ended questions that the Court would have to answer.

Furthermore, even if the Court were to find that the Plaintiff would be unable to make a showing that he meets or medically equals Listing 112.03, that does not end the inquiry. The Plaintiff's diagnosis of "psychotic disorder, not otherwise specific," was not even evaluated by the ALJ. It is unclear to the Court whether the ALJ simply overlooked the effect of the diagnosis completely or whether she found the diagnosis was a not severe impairment and had no effect on the Plaintiff's ability to function. While the ALJ mentioned in passing that the Plaintiff was

12

diagnosed with a psychotic disorder [Tr. 16], the ALJ later concluded [Tr. 23] that the record indicated that the Plaintiff was being treated for ADHD *with* psychosis but that he had improved significantly with medications. The ALJ appears to have treated the Plaintiff's psychotic disorder and ADHD as mutually exclusive, rather than analyzing the impairments singularly to determine whether the psychotic disorder alone or in combination with other impairments, *i.e.*, ADHD, had an effect and the extent of that effect on the Plaintiff.

Because step three confers an important procedural benefit on the Plaintiff, the evaluation of the Plaintiff's psychotic disorder, including its severity and whether it meets or medically equals Listing 112.03, is more appropriately tasked for the ALJ. Accordingly, the Plaintiff's allegation of error is well-taken. The Court will recommend that this case be remanded to the ALJ to: (1) fully analyze and compare the evidence in this case with Listing 112.03A and B; and (2) address whether the Plaintiff's psychotic disorder is a severe impairment and the effect, if any, it has on the Plaintiff's ability to function. Given the limited amount of medical evidence dated after July 2010, the ALJ is directed to acquire additional medical evidence and/or opinions as needed to fully develop and better address this issue.

### B.     Functional Equivalence

The Plaintiff also argues that the ALJ's step three evaluation was flawed because she erroneously found that the Plaintiff did not functionally equal a listing. [Doc. 22 at 26]. The Plaintiff asserts that he had at least "marked" limitations in the domains of interacting and relating with others and caring for yourself. [Id. at 27, 29]. The Plaintiff maintains that the ALJ failed to address significant evidence, which contradicts her findings within these two domains, and further failed to adequately explain her findings. [Id. at 26].

13

The Commissioner contends that the Plaintiff failed to show "marked" limitations in either domain, and therefore, substantial evidence supports the ALJ's finding that the Plaintiff had "less than marked limitations" in each domain. [Doc. 25 at 20].

As mentioned above, to functionally equal a listed impairment, a plaintiff must have "marked" limitations in at least two of the six functional domains or an "extreme" limitation in one of the six functional domains. 20 C.F.R. § 416.926a(b)(1). A "marked" limitation occurs when the child's impairment interferes seriously with the ability to independently initiate, sustain, or complete activities. § 416.926a(e)(2)(i). An "extreme" limitation occurs when the child's impairment interferes very seriously with the ability to independently initiate, sustain, or complete activities. 416.926a(e)(3)(i).

As to interacting and relating to others, this domain considers how well a child initiates and sustains emotional connections with others, develops and uses the language of his or her community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of other's possessions. § 416.926a(i). For a child between the ages of 6 and 12, the child should be able to develop more lasting friendships with other age-like children, understand how to work in groups, demonstrate increasing ability to understand another's point of view and tolerate differences, talk to people of all ages in order to share ideas, tell stories, and speak in a manner that both familiar and unfamiliar listeners can understand. § 416.926a(i)(2)(iv).

In regard to caring for yourself, this domain considers how well the child maintains a healthy emotional and physical state, including how well the child gets his or her physical and emotional wants and needs met in appropriate ways, how the child copes with stress and changes in his or her environment, and whether the child takes care of his or her own health, possessions, and living area. § 416.926a(k). For children between the ages of 6 and 12, a child should be

14

independent in most day-to-day actives such as dressing him or herself, be able to recognize that he or she is competent in doing some activities while having difficulty with others, identify circumstances when he or her feels good and bad about him or herself, develop an understanding of what is right and wrong, what is acceptable and unacceptable behavior, and demonstrate consistent control over his or her behavior and avoid unsafe behaviors. § 416.926a(k)(2)(v).

In the present matter, the ALJ thoroughly outlined the rules and criteria for determining whether a child's impairment functionally equals a listed impairment, ultimately concluding that the Plaintiff had "less than marked limitations" in the domains of interacting and relating to others and caring for yourself. [Tr. 21-22]. In regard to interacting and relating to others, the ALJ explained that "[a]lthough the claimant's teacher reported that he had no problems interacting with others, *the claimant's guardian indicated that the claimant was often destructive at home*. The records indicate that the claimant's behavior problems improved with medications." [Tr. 21]. As to caring for yourself, the ALJ found that "[t]he claimant's teacher reported that the claimant had some difficulty handling frustration and knowing when to ask for help. *His aunt/guardian also noted that the claimant often could not distinguish fantasy from reality and that he is not aware of dangers*." [Tr. 22] (emphasis added).

The problem the Court has with the ALJ's analysis is that 95% of it is dedicated to restating the rules and regulations for assessing functional equivalency, followed by two sentences ostensibly explaining why the Plaintiff has less than marked limitations in each of the challenged domains. However, half of each sentence appears to belie the ALJ's findings (see italicized sentences above). The ALJ's purported reasons are nothing short of conclusory statements, the brevity and substance of which fails to provide a meaningful explanation of the Plaintiff's assessed limitations.

15

The regulations provide a list of examples of limited functioning in each domain. Examples of limited functioning in interacting and relating to other includes when the child has no friends, experiences anxiety or fear over meeting new people, experiences difficulty playing games or sports with rules, and has difficulty communicating with others. 20 C.F.R. § 416.926a(i)(3)(i-vi). While the ALJ recognized that the Plaintiff was destructive at home, the record contains a much broader picture of the Plaintiff's behavior. Testimony and treatment notes relate various instances in which Ms. Weisgarber reported that the Plaintiff has a hard time following rules, respecting the possession of others, listening to authority, responding appropriately in different social situations, and accepting when he is wrong. [Tr. 36, 168, 296, 528, 539, 540]. In addition, Dr. Reno opined that the Plaintiff "did not tend to view relationships in a positive or typical manner and his projective testing indicate that he was much more immersed in fantasy than most children his age." [Tr. 298]. She further recommend that the Plaintiff would need modifications and accommodations for written work due to written expression deficits. [Tr. 299]. Although the ALJ correctly notes that a teacher reported that the Plaintiff did not have problems interacting with others, evidence that the ALJ should have indeed considered, the Court is unable to reconcile the apparent significance given to this standalone opinion when the record contains conflicting evidence, including the opinion of an acceptable medical source—Dr. Reno—whose opinion is neither mentioned nor discussed by the ALJ.

The ALJ's finding regarding caring for yourself is similarly lacking. Examples of limited functioning within this domain include when a child uses self-soothing activities that show developmental regression, does not dress or bathe him or herself appropriately considering the child's age, engages in self-injurious behavior, and demonstrates a disturbance in eating or sleeping patterns. 20 C.F.R. § 416.926a(k)(3)(i-vi). Here, the ALJ only references two pieces of

16

evidence, a teacher's report that the Plaintiff sometimes gets frustrated and does not know when to ask for help and Ms. Weisgarber's allegation that the Plaintiff is not aware of danger, and then somehow concludes that the Plaintiff has "less than marked limitations" without any reconciliation of how the teacher's report and Ms. Weisgarber's allegation translate into such a finding. The record is replete with evidence that the Plaintiff has engaged in a cycle of self-injurious behavior and has trouble sleeping. A risk assessment completed by Youth Villages in September 2009, noted that the Plaintiff has a history of threats or attempts to harm himself or others, has a potential for violent, reckless, or impulsive behavior, and current and past fire-setting behavior. [Tr. 490]. In addition, at the time the Plaintiff was assessed by Youth Villages, he had been awake for 48 hours in order receive messages from "monsters" and "wizards" and had stated that he would rather die than go to sleep and have more nightmares. [Tr. 490, 496]. Moreover, the Plaintiff's history of hallucinations and delusions has caused him to jump out of a second story window [Tr. 532] and, according to Ms. Weisgarber, the Plaintiff has punched holes in his bedroom walls to get to the voices [Tr. 43]. The brevity of the ALJ's discussion simply offers no insight for arriving at her conclusion.

As a result, the Court finds that the ALJ's discussion regarding the above two domains is so abbreviated that the ALJ's findings of "less than marked limitations" is not sufficiently explained. Therefore, the Court finds that the Plaintiff's allegation of error in this regard is well-taken, and the Court will also recommend remand on this issue in order for the ALJ to provide a full and complete discussion as to whether the Plaintiff has "marked" or "extreme" limitations in the functional domains of interacting and relating to others and carrying for yourself, explaining the assigned degree of limitation by pointing to specific evidence in support of such findings.

17

## C.     Medical Opinions

The Plaintiff next argues that the ALJ violated the treating physician rule because she ignored the opinions of Drs. Greeson and Reno.  [Doc. 22 at 32].  More specifically, the Plaintiff maintains that the ALJ never discussed what weight she assigned to Dr. Greeson's opinion and completely failed to even mention Dr. Reno's psychological evaluation and report.  [Id.].  While the ALJ assigned "significant weight" to the opinions provided by state agency physicians, the Plaintiff argues that such was error because the state agency physicians failed to give a reason for disagreeing with a treating physician's opinion.  [Id. at 35-36].

The Commissioner maintains that the ALJ properly evaluated both medical opinions. [Doc. 25 at12].  First, the Commissioner asserts that although the ALJ failed to state the weight she gave to Dr. Greeson's opinion, the error was harmless because even accepting Dr. Greeson's findings as true, the opinion actually supports the ALJ's conclusion that the Plaintiff showed improvement with medication during the relevant time period.  [Id. at 13].  Second, the Commissioner contends that Dr. Reno was not a treating physician, and therefore, the ALJ had no obligation to specifically address or weigh Dr. Reno's opinion.  [Id. at 14].  Nonetheless, the Commissioner asserts that Dr. Reno's opinion likewise supports the ALJ's finding that the Plaintiff showed improvement after his medication was adjusted.  [Id. at 15].  Lastly, the Commissioner argues that because the opinion of Dr. Greeson, the only treating source of record, supports the ALJ's decision, the ALJ did not improperly defer to a non-treating, non-examining source over a treating source.  [Id. at 20].

The Plaintiff clarifies in his response that even if Dr. Reno is not considered a treating source, her opinion must be considered pursuant to 20 C.F.R. § 416.927(c).  [Doc. 26 at 3]. Moreover, Dr. Reno was a specialist who extensively tested the Plaintiff thereby entitling her

18

opinion to greater weight than a non-treating, non-examining source. [Id. at 3-4].

The Commissioner filed a reply arguing that because Dr. Reno was not a treating source, the regulations only require the ALJ to consider her opinion, which she did, as opposed to explicitly addressing it in the disability determination. [Doc. 28 at 2].

### 1. Gordon Greeson, M.D.

Dr. Greeson has been the Plaintiff's treating physician since 2009. [Tr. 217]. In November 2009, Dr. Greeson noted that the Plaintiff had a long history of hallucinations and was taking Diazepam for night terrors. [Tr. 580]. During a visit two months later, treatment notes document that the Plaintiff's medication was not working well as Ms. Weisgarber reported that the Plaintiff had hallucinations, dream issues, anxiety, excessive talking, especially about death and stabbing, and was obsessed with video games. [Tr. 573]. Dr. Greeson observed that the Plaintiff was totally disconnected during the session. [Id.]. The Plaintiff had recently discontinued Valium and was taking Focalin. [Tr. 574]. Dr. Greeson suspected possible Asperger's disease and/or autism and referred the Plaintiff to Dr. Reno for a psychological evaluation. [Tr. 410, 574].

In February 2010, Dr. Greeson assigned the Plaintiff a GAF score of 42, indicating serious symptoms. [Tr. 410]. The Plaintiff had reportedly tried to strangle himself several days earlier. [Id.]. Despite poor behavior at home, he was apparently doing well in school. [Id.]. In addition, although he had not experience any night terrors in several months, his sleep remained poor. [Id.]. The Plaintiff continued taking Focalin and started a trial of Mirtazapine. [Id.].

In May 2010, after being discharged from Peninsula Psychiatric Hospital for hearing voices and jumping out of a second story window, the Plaintiff was seen by Dr. Greeson for an aftercare appointment. [Tr. 399]. The Plaintiff was assigned a GAF score of 46, continuing to

19

indicate serious symptoms. [Id.]. Treatment notes related that the Plaintiff had completed the school year with no major behavior problems and had received B's and C's, although it was recommended by the school's psychologist that he be tested for a written language learning disability. [Tr. 393, 399]. His home life was reported to be going well despite continued issues with sleep and hyperactivity. [Tr. 399]. The Plaintiff's medication was changed back to Diazepam and he began a trial of Abilify. [Id.]. The following month, the Plaintiff was reported to have a better attitude, was less reactive and angry, and easier to get along with. [Tr. 395]. Dr. Greeson noted that Dr. Reno had completed her psychological evaluation and diagnosed the Plaintiff with psychotic disorder, not otherwise specific, and a learning disability. [Id.].

By August 2010, the Plaintiff was weaned off Diazepam as he had not experienced any hallucinations or night terrors. [Tr. 389]. While the Plaintiff was sleeping better, he continued to be up some nights and Ms. Weisgarber complained that the Plaintiff continued to bully his younger siblings. [Id.]. Dr. Greeson observed that the Plaintiff answered when spoken to directly, had good eye contact, and appeared under control emotionally. [Id.]. The Plaintiff's teacher reported that he exhibited no ADHD symptoms, was calming down more quickly, and had some difficulties in reading and math. [Id.]. A GAF score of 48, again indicating serious symptoms, was assigned at two separate appointments in August. [Tr. 389, 468].

In a letter authored by Dr. Greeson in November 2011, he requested that the Plaintiff be excused from testifying at the hearing before the ALJ. [Tr. 217]. Dr. Greeson explained that since 2009, the Plaintiff "has made a lot of progress" and that while his mood was stable at his most recent visit on October 6, 2011, his mood "has been so unstable in the past as to necessitate hospitalization." [Id.]. As a result, Dr. Greeson believed it best that the Plaintiff not be a part of the hearing, opining that "such a stressful situation . . . may be enough to cause severe regression

20

and would be extremely too taxing for this youngster." [Id.].

In the disability determination, the ALJ noted that the Plaintiff was seen at the Helen Ross McNabb Center, which is where Dr. Greeson practiced, in 2010 for ADHD. [Tr. 17]. The ALJ continued:

> In a visit in January 2010, it was noted that the claimant's aunt indicated that the claimant showed improvement with his sleep, mood, attention, and anxiety when he was on Valium. However, she noted that the claimant's symptoms returned about a month earlier when his mediations were changed and Valium was discontinued. According to the claimant's aunt, he did well when his sleep was good. It was noted that the claimant experienced increased anger and irritability, but no significant behavior problems in school. The claimant was assessed with ADHD, combined type and a GAF score of 47. He was treated with additional medications with some improvement in focus and school. Treatment records in April 2010 reveal that the claimant also had some improvement in his sleep, but with some night terrors. It was later noted that the claimant was admitted to the hospital on May 24, 2010, for 2 days following an episode of hearing voices. Medical records indicate that the claimant jumped out of a 2-story window, without injury, because of his voices. During hospitalization, it was noted that the claimant responded well to medications and therapy. He was discharged in stable condition. In follow-up visits with Gordon Greeson, M.D., it was reported that the claimant was doing well and that his sleep and behavior had improved. (Exhibits 13F and 27F).

[Id.].

Under the Social Security Act and its implementing regulations, if a treating physician's opinion as to the nature and severity of an impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, it must be given controlling weight. 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2). But where an opinion does not garner controlling weight, the appropriate weight to be given to an opinion will be determined based upon the following factors: length of

21

treatment, frequency of examination, nature and extent of the treatment relationship, amount of relevant evidence that supports the opinion, the opinion's consistency with the record as a whole, the specialization of the source, and other factors which tend to support or contradict the opinion. 20 C.F.R.§§ 404.1527(c)(2) and 416.927(c)(2).

When an ALJ does not give a treating physician's opinion controlling weight, the ALJ must always give "good reasons" for the weight given to a treating source's opinion in the decision. 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2). A decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for the weight." Soc. Sec. Rul. 96-2p, 1996 WL 374188 at *5 (1996). Nonetheless, the ultimate decision of disability rests with the ALJ. See King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984); Sullenger v. Comm'r of Soc. Sec., 255 F. App'x 988, 992 (6th Cir. Nov. 28, 2007).

The Court finds the ALJ erred in her treatment of Dr. Greeson's opinion. The ALJ failed to specify what weight, if any, he assigned to Dr. Greeson's opinion, namely the November 2011 letter discussing the Plaintiff's mental status and stability. The ALJ was required to assign a specific weight to Dr. Greeson's opinion, and the failure to do so "alone constitutes error." Cole v. Astrue, 661 F.3d 931, 938 (6th Cir. 2011); see also Blakley, 581 F.3d at 408 (holding "[a] finding that a treating source medical opinion . . . is not entitled to controlling weight [does] not [mean] that the opinion should be rejected").

The Court is not persuaded by the Commissioner's position that the error was harmless because Dr. Greeson's opinion essentially supports the ALJ's conclusion that the Plaintiff was not disabled because of positive responses to mediation changes. See Wilson, 378 F.3d at 547

22

(observing that "[t]here is also the possibility that if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion, it may be irrelevant that the ALJ did not give weight to the treating physician's opinion, and the failure to give reasons for not giving such weight is correspondingly irrelevant").  The Commissioner attempts to oversimplify Dr. Greeson's opinion by essentially arguing that because Dr. Greeson noted improvement, the Plaintiff must have improved to the extent that his psychotic disorder no longer had any limiting effect on him.  The Court disagrees with the characterization of the opinion.  The Plaintiff's noted improvement and mood stability should not be read as an absolute because Dr. Greeson cautioned that the Plaintiff "has been so unstable in the past" and that simply testifying at the hearing could be enough to cause regression.  Moreover, Dr. Greeson's August 2010 treatment notes, the most recent treatment notes in the record, assessed the Plaintiff with a GAF score of 48, indicating serious symptoms, despite noted improvement with medication change.  Without any meaningful discussion by the ALJ regarding the weight assigned to Dr. Greeson's opinion and the reasons for that weight, the Court would have to make an assumption that Dr. Greeson's opinion supports the ALJ's finding.

Accordingly, the Court will recommend that the case be remanded to the ALJ on this issue as well.

### 2.  *Angela Reno, Psy. D.*

In determining the level of deference the ALJ was required to give Dr. Reno, the Court "must first determine the medical source's classification."  Ealy v. Comm'r of Soc. Sec., 594 F.3d 504, 514 (6th Cir. 2010).  While an ALJ is required to "evaluate every medical opinion [he or she] receive[s]," 20 C.F.R. § 404.1527(c), all medical sources are not treated equally.  Smith v. Comm'r of Soc. Sec., 482 F.3d 873, 875 (6th Cir. 2007).

23

Under the Social Security Act and its implementing regulations, there are three types of acceptable medical sources:  non-examining sources, nontreating (but examining) sources, and treating sources.  20 C.F.R. § 404.1502.  Because Dr. Reno personally examined the Plaintiff, she qualifies as either a nontreating, examining source or a treating source.  A nontreating, examining source is one who has examined a claimant "but does not have, or did not have, an ongoing treatment relationship with" the claimant.  Id.  A treating source, on the other hand, is one "who has, or has had, on an ongoing treatment relationship" with the claimant.  Id.  An "ongoing treatment relationship" occurs when a claimant is, or has, seen the medical source with a "frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)."  Id.  A physician seen infrequently may still be considered a treating source "if the nature and frequency of the treatment or evaluation is typical for [the] condition(s)."  Id.

In the present matter, the Court agrees with the Commissioner that Dr. Reno was not a treating source.  Dr. Reno's treatment notes reveal that she intended to examine the Plaintiff only for a limited time and for the limited purpose of diagnosing the Plaintiff and providing recommendations on how best to proceed regarding further assistance and medical treatment of such diagnosis.

To meet this goal, treatment notes reveal that Dr. Reno met with the Plaintiff on four separate occasions in March, April, and May 2010, for the sole purpose of conducting a psychological evaluation and issuing a report.  [See Tr. 328-34].  During her first visit with the Plaintiff in March, Dr. Reno noted that she was seeing the Plaintiff "for an evaluation to assist with diagnostic clarification at the recommendation of Dr. Greeson, his psychiatrist."  [Tr. 336].  The evaluation was to be conducted in a manner where the Plaintiff would be seen for one to

three sessions over the course of six months in order to perform psychological testing. [Tr. 353]. Two sessions were conducted in April, at which time the Plaintiff completed IQ and achievement testing and clinical measures. [Tr. 326-27]. In May, the Plaintiff completed an additional interview in order for Dr. Reno to update information for the evaluation. [Tr. 325]. Dr. Reno then issued a report in June, summarizing her findings from the evaluation. [Tr. 329-34]. The Plaintiff was seen one additional time for a follow-up appointment in July 2010, at which time Dr. Reno noted, "No plans for more sessions, but will get him hooked up with another therapist." [Tr. 323].

Based upon the foregoing, the record is clear that there was a specific, limited objective for seeing Dr. Reno between March and July 2010: diagnostic clarification. Once a diagnosis was reached, the Plaintiff was no longer seen by Dr. Reno. Accordingly, the Court finds that an ongoing treatment relationship was not established, nor was it ever intended to be established by either the Plaintiff or Dr. Reno. Thus, the Court finds that Dr. Reno is not a treating source, but rather a nontreating, examining source.

The Court must now determine whether the ALJ's treatment of Dr. Reno's opinion was proper given that she was a nontreating, examining source. As state above, in evaluating a claim for disability, the ALJ must evaluate every medical opinion received. 20 C.F.R. § 404.1527(c). It is well-established, however, that an ALJ is not required to discuss all of the relevant evidence in the record, nor is he required to comment on every finding in a medical opinion. See Boseley v. Comm'r of Soc. Sec., 397 F. App'x 195, 199 (6th Cir. Sept. 30, 2010) ("Neither the ALJ nor the Council is required to discuss each piece of data in its opinion, so long as they consider the evidence as a whole and reach a reasoned conclusion."). The opinion of a medical source who has examined the claimant, however, will generally be given more weight than the opinion of a

25

source who has not examined the claimant. 20 C.F.R. § 404.1527(c)(1). In addition, "[t]he better explanation a source provides for an opinion," and the more relevant evidence a source gives to support the opinion, "particularly medical signs and laboratory findings," the more weight the opinion will be given. § 404.1527(c)(3).

Here, Dr. Reno was a clinical, developmental psychologist who performed extensive testing and evaluation of the Plaintiff at Dr. Greeson's request. The procedures entailed during the evaluation included reviewing the Plaintiff's records and documentation, conducting behavior observations, as well as clinical interviews with the Plaintiff and Ms. Weisgarber, and employment of various tests including the Theory of Mind Tasks, the Differential Ability Scales-Second Education, the Behavior Assessments System for Children-Second Edition, the Adaptive Behavior Assessment System-Second Edition, and the Rorschach Inkblot Test. [Tr. 328]. After conducting these procedures over the course of four sessions in three months, Dr. Reno issued a detailed, seven page report in June 2010. [Tr. 328-34].

Dr. Reno found that the Plaintiff had a very chaotic history and many problems by the time he reached the age of six and came under the care of Ms. Weisgarber. [Tr. 329]. Such problems included defiant behaviors, difficulty with reality versus fantasy, nightmares and night terrors, insomnia, hallucinations, difficulties at home and at school with work compliance, distractibility, inattention, and dealing with stressors and limits. [Tr. 329-30]. Dr. Reno observed the Plaintiff to have marked impulsivity, sometimes odd or unusual responses, difficulty siting still and doing work, was quite fantasy oriented, and experienced multiple letter and number reversals in many different subsets of testing. [Tr. 330].

While the Plaintiff's overall IQ scores were in the average range, the Plaintiff demonstrated marked discrepancies between his verbal abilities and spatial abilities with verbal

abilities falling in the high range and spatial abilities falling below average range, causing his IQ scores to fall in the average range. [Tr. 330-31]. The Plaintiff's various test scores also indicated that he was somewhat impacted by attention, concentration, and impulsivity, and his writing samples were substantially lower than would be expected. [Tr. 331].

As to clinical measures, Dr. Reno noted marked impairment, finding that the Plaintiff endorsed many symptoms of psychosis. [Tr. 332]. While the Plaintiff "seemed to recognized the difference between what was supposed to be real and what was supposed to be pretend, [] he felt confused often because he had hallucinations which crossed those lines and made it difficult for him to determine real versus pretend." [Id.]. Dr. Reno also found that the Plaintiff had difficulty understanding his own emotional state and substantial behavior problems and difficultly with attention and impulsivity. [Tr. 332].

Dr. Reno summarized that while the Plaintiff had traits and symptoms of Asperger's disorder, his symptomatology could best be accounted for by a diagnosis of serious emotional disturbance secondary to a psychotic disorder, not otherwise specified. [Tr. 332-33]. In addition, due to a substantial discrepancy between the Plaintiff's reading and writing abilities, Dr. Reno opined that the Plaintiff suffered from a written language learning disability and qualified for special education intervention services. [Tr. 333].

In conclusion, Dr. Reno recommended that the Plaintiff: (1) continue to engage in medication management of psychiatric symptomatology; (2) continue outpatient therapy; (3) request school modifications to assist with written expression deficits, occupational therapy to assist with some of his fine motor writing problems, and school personnel may want to consider special education certification under Seriously Emotionally Disturbed if the Plaintiff continued to have marked difficulties; and (4) obtain case management services to help Plaintiff's family

27

with safety issues and assist the Plaintiff with behavioral management. [Tr. 333-34].

Following the report, the Plaintiff was seen one additional time in July 2010. [Tr. 323]. Dr. Reno noted improvement since the Plaintiff had begun new medication. [Id.]. Specifically, the Plaintiff had better clarify, few psychotic symptoms, better mood and behavior, and had generally improved in overall all functioning. [Id.]. During the session, she worked with Plaintiff's family on ways to improve behavior compliance, and noted that the Plaintiff was still involved in sleep studies with other medical providers. [Id.]. In addition, Dr. Reno reaffirmed that the Plaintiff needed outpatient therapy. [Id.].

Nowhere in the disability determination does the ALJ reference Dr. Reno, her treatment notes, or her June 2010 report. The Court finds the omission to be completely erroneous. When dealing with mental disorders, our appellate court has recognized the unique role and function mental health professionals, such as Dr. Reno, are able to provide:

> In general, mental disorders cannot be ascertained and verified as are most physical illnesses, for the mind cannot be probed by mechanical devices [sic] in order to obtain objective clinical manifestations of medical illness. . . . [W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology.

Blankenship v. Bowen, 874 F.2d 1116, 1121 (6th Cir. 1989) (quoting with approval Poulin v. Bowen, 817 F.2d 865, 873-74 (D.C. Cir. 1987) (internal brackets in the original). Here, not only was Dr. Reno a key medical provider, no other medical source of record offers the amount of in-depth analysis and testing than that of Dr. Reno. Thus, her report was arguably one of the most vital pieces of evidence in the entire record. Without any indication that the report was even considered, the Court finds that the ALJ's decision cannot stand.

The Court finds unavailing a number of arguments the Commissioner sets forth in

28

maintaining that the omission was harmless. First, the Commissioner asserts that Dr. Reno's July 2010 examination, which was conducted after she issued her report, supports the ALJ's finding that the Plaintiff had improved once his medication was changed. This argument was similarly raised, and rejected by the Court, in regards to the ALJ's failure to address Dr. Greeson's opinion. To accept the Commissioner's position, the Court would have to assume that the Plaintiff's noted improvement was so significant that Dr. Reno's findings made one month prior no longer carried any weight. The Court declines to make such a bare faced assumption. Second, the Commissioner states that Dr. Reno's report supports the opinion of the state agency physician whom was assigned "significant weight" by the ALJ. The ALJ noted that the state agency had opined that the Plaintiff had improved with his behavior problems, mood, and academics. [Tr. 18]. Whether the opinion of a nonexamining source is consistent with Dr. Reno's findings is for the ALJ to decide in the first instance, not the Court. Lastly, the Commissioner contends that the ALJ's statement that she has "considered all the evidence of record" was a sufficient indication that the ALJ did in fact consider Dr. Reno's report. This conclusory, overarching, unexplained statement is not legally sufficient, and the proposition likewise requires speculation on the Court's behalf which it declines to do.

Accordingly, the Court will recommend that the case be remanded on this issue as well in order for the ALJ specify what weight she assigned to Dr. Reno's report and the reason for that weight.

**D.    Credibility Finding**

Finally, the Plaintiff argues that the ALJ failed to make a proper credibility determination in regards to the treatment and weight assigned to Ms. Weisgarber's testimony and other opinion

evidence. [Doc. 22 at 37]. More specifically, the Plaintiff argues that the ALJ failed to make a credibility determination pursuant to the factors outlined in Social Security Ruling 96-7p, and instead, provided boilerplate language for her finding which makes it difficult to ascertain what the credibility determination was actually based upon. [Id. at 37-38].

The Commissioner maintains that the ALJ properly considered several factors under Social Security Ruling 96-7p, including treatment records, in making a credibility finding. [Doc. 25 at 17]. Moreover, the Commissioner argues that treatment records, medical opinion evidence, and school records provide substantial evidence in supporting the ALJ's finding. [Id.].

In weighing the Plaintiff's credibility, the ALJ found that while the Plaintiff's impairments could be expected to produce the alleged symptoms, "the statements concerning the intensity, persistence and limiting effects of those symptoms are not credible to the extent they are inconsistent with finding that the claimant does not have an impairment or combination of impairments that functionally equals the listings." [Tr. 18]. The ALJ based her finding on the following: (1) medical evidence showed that the Plaintiff's symptoms related to behavioral problems and asthma were controlled with medications; (2) Ms. Weisgarber stated that the Plaintiff does well when his sleep is adequate; and (3) treatment records demonstrated improvement regarding Plaintiff's behavior, anger, focus, and school work since his medication was adjusted. [Id.].

"In evaluating complaints of pain, an ALJ may properly consider the credibility of the claimant." Walters, 127 F.3d at 531. Our appellate court has articulated the standard for evaluating subjective complaints as follows:

> First, we examine whether there is objective medical evidence in an underlying medical condition. If there is, we then examine (1) whether objective medical evidence confirms the severity of the

alleged pain arising from the condition; or (2) whether the
objectively established medical condition is of such a severity that
it can reasonably be expected to produce the alleged disabling
pain.

Duncan v. Sec. of Health & Human Servs., 801 F.2d 847, 853 (6th Cir. 1986).

In deciding whether the objective evidence confirms the severity of the alleged pain or
whether the objectively established medical condition is of such a severity that it can reasonably
be expected to produce the alleged disabling pain, the ALJ must consider the following factors:
(i) daily activities; (ii) the location, frequency, and intensity of the pain or other symptoms; (iii)
precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any
medication you take or have taken to alleviate your pain or other symptoms; (v) treatment, other
than medication, received or have received for relief of pain or other symptoms; (vi) any
measures that are used or were used to relieve pain or other symptoms; (vii) other factors
concerning functional limitations and restrictions due to pain or other symptoms. Soc. Sec. Rul.
96-7p, 1996 WL 374186, at *3 (1996); 20 C.F.R. § 1529(c)(3).

Although the ALJ is not required to address every factor, the ALJ's "decision must
contain specific reasons for the finding on credibility, supported by the evidence in the case
record, and must be sufficiently specific to make clear to the individual and to any subsequent
reviewers the weight the adjudicator gave to the individual's statements and the reasons for that
weight." Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *2. Moreover, when supported by
substantial evidence, the ALJ's findings regarding credibility "are to be accorded great weight
and deference, particularly since an ALJ is charged with the duty of observing a witness's
demeanor and credibility." Walters, 127 F.3d at 531.

The Court finds that substantial evidence does not support the ALJ's credibility finding.

31

Because the ALJ failed to include and discuss relevant medical evidence at step three of the sequential evaluation in addition to overlooking Dr. Reno's report and failing to properly weigh Dr. Greeson's opinion, the Court finds that the ALJ did not take into account the whole record when she weighed Ms. Weisgarber's credibility. See Hurst v. Sec'y of Health & Human Servs., 753 F.2d 517, 519 (6th Cir. 1985) (holding that the "failure to consider the record as a whole undermines" the denial of benefits). Thus, the Court is unable to engage in meaningful substantial evidence review of the credibility determination where the ALJ has parsed through selective medical records and fails to provide a full analysis or discussion for arriving at various conclusions. Even if the Commissioner could successfully argue that the ALJ properly applied the relevant factors for assessing credibility, failure to perform a proper analysis of the medical evidence pursuant to agency rules and regulations, as well as controlling case law, denotes a lack of substantial evidence supporting an adverse credibility finding. See 5 U.S.C. § 706(2)(D) ("The reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . without observance of procedure required by law."); Wilson, 378 F.3d at 545 ("It is an elemental principle of administrative law that agencies are bound to follow their own regulations.").

Therefore, the Court finds the Plaintiff's argument is well-taken. The Court will recommend that this issue be remanded in order for the ALJ to explain, with specificity according to Social Security Rule 96-7p, what statements are and are not credible and what evidence supports that finding.

## VI.    CONCLUSION

Therefore, it is hereby **RECOMMENDED**[3] that Plaintiff's Motion for Summary Judgment [**Doc. 21**] be **GRANTED** and the Commissioner's Motion for Summary Judgment [**Doc. 24**] be **DENIED**.  The Court recommends that the case be remanded to the ALJ to:

> (1) Fully analyze and compare the evidence in this case with Listing 112.03A and B _and_ address whether the Plaintiff's psychotic disorder is a severe impairment and the effect, if any, it has on the Plaintiff's ability to function;

> (2) Provide a full and complete discussion as to whether the Plaintiff has "marked" or "extreme" limitations in the functional domains of interacting and relating to others and carrying for yourself _and_ provide a more thorough discussion of the evidence which supports the assigned degree of limitation;

> (3) Specify the weight assigned to Dr. Greeson's opinion and the reasons for such weight pursuant to 20 C.F.R. 404.1527(c);

> (4) Identify the weight Dr. Reno's report is entitled and the reason for such weight; and

> (5) Reweigh the Plaintiff's and Ms. Weisgarber's credibility pursuant to Social Security Rule 96-7p.

Respectfully submitted,


_____ s/ C. Clifford Shirley, Jr._____
United States Magistrate Judge

---

[3] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party.  Fed. R. Civ. P. 72(b)(2).  Such objections must conform to the requirements of Rule 72(b), Federal Rules of Civil Procedure.  Failure to file objections within the time specified waives the right to appeal the District Court's order.  Thomas v. Arn, 474 U.S. 140 (1985).  The district court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive or general.  Mira v. Marshall, 806 F.2d 636 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  Smith v. Detroit Federation of Teachers, 829 F.2d 1370 (6th Cir. 1987).